UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BERNIE 2016, INC.**<br>**131 Church Street, Suite 300**<br>**Burlington, VT 05401,**<br><br>*Plaintiff*<br><br>**v.**<br><br>**DNC SERVICES CORPORATION,**<br>  **d/b/a DEMOCRATIC NATIONAL**<br>  **COMMITTEE**<br>**430 S. Capitol Street, S.E.**<br>**Washington, D.C.  20004**,<br><br>*Defendant* | Case No. |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, by its attorneys Garvey Schubert Barer, hereby complains of the Defendant and alleges:

## JURISDICTION AND VENUE

1)      Jurisdiction of this Court over Plaintiff's claims is predicated on 28 U.S.C. § 1332.   There is complete diversity of citizenship between Plaintiff and Defendant.   Upon information and belief, Plaintiff is sustaining irrrepable injury and financial losses as a result of Defendant's ongoing breach of the Parties' Agreement Regarding Use of DNC National Voter File Data (the "Agreement") that are incapable of precise calculation, but exceed $600,000.00 per day.

2)      Venue is proper in this District because the Agreement applies the law of the District of Columbia, Defendant is domiciled in this District, and Defendant maintains its principal places of business in this District.

## PARTIES

3)      At all times hereinafter mentioned, Plaintiff Bernie 2016, Inc. (the "Campaign") was, and is, a not-for-profit corporation and political organization organized under the laws of the State of Vermont, consistent with the Federal Election Campaign Act of 1971.   The Campaign is the election vehicle for 2016 national presidential candidate Bernie Sanders.   The Campaign maintains its principal place of business at 131 Church Street, Suite 300, Burlington, Vermont.

4)      Upon information and belief, DNC Services Corporation, d/b/a Democratic National Committee (the "DNC") at all times relevant hereto was, and is, a not-for-profit corporation organized under the laws of the District of Columbia, as the operating body of the United States Democratic Party.   Upon information and belief, the DNC maintains its principal place of business at 430 South Capitol Street Southeast, in Washington, District of Columbia.

## FACTS

### *The Agreement*

5)      On or about October 26, 2015, the Campaign and the DNC entered an agreement captioned "Agreement Between the DNC and Presidential Campaign Committees Regarding use of DNC National Voter File Data" (the "Agreement").   A true and correct copy of the Agreement, with appendices, is annexed hereto as "Exhibit A."

6)      The Agreement establishes a licensing arrangement whereby the Campaign is to be granted limited access to data ("Voter Data") from the DNC's voter file, including but not

limited to: demographic and geographic data for registered voters (such as name, address and jurisdiction); email addresses; voter registration status; telephone numbers; vote history; commercially acquired consumer data; ethnicity information; political party preference or affiliation, if any; candidate preference data, if any; and other key analytic metrics selected by the DNC.

7)      Upon information and belief, the DNC licenses its Voter Data to all candidates for the Democratic Party nomination for the 2016 national presidential election.

8)      The Voter Data is hosted by, and accessed via software provided by NGP VAN, a third-party vendor under contract with the DNC.

9)      The Voter Data is vital to the fundraising and voter identification efforts of all presidential candidates – but it is especially critical to the Campaign, which has been financed primarily with contributions from individual donors rather than Political Action Committees ("PACs")

10)     In a fundraising drive conducted between December 14, 2015 and December 16, 2015, the Campaign raised more than $2,400,000.00.  Most of this money came from individual donors identified through, *inter alia*, the strategic use of Voter Data.

11)     The DNC has one of the most powerful political apparatuses in the nation. Candidates seeking the nomination of the Democratic Party for public office rely heavily on the support of the DNC to organize and publicize their campaigns.

12)     The loss of access to the Voter Data could significantly disadvantage, if not cripple, a Democratic candidate's campaign for public office.

13)     In view of the national political importance of the Campaign -- and by extension, the importance of the Voter Data and the Agreement -- the Agreement substantially restricts both

Parties' rights of termination to cases of prolonged and voluntary breach.  The Agreement states, in relevant part:

> Either party may terminate this Agreement in the event that the other party breaches this Agreement; <u>the non-breaching party sends written notice to the breaching party describing the breach; and the breaching party does not cure the breach to the satisfaction of the non-breaching party within ten (10) calendar days following its receipt of such notice.</u>

Exhibit A., ¶ 6(b) (emphasis added).

14)     The Agreement does not permit either Party to suspend its performance of the Agreement prior to terminating the Agreement in accordance with the provision above.

15)     The Agreement does not permit either Party to terminate or suspend the Agreement without notice, or without providing the breaching Party with the requisite opportunity to cure.

16)     The Agreement requires the DNC to "use security measures, with respect to the Campaign Data, that are consistent with good practices in the data processing industry." Agreement, ¶ 3(f).  Under the Agreement, the DNC warrants that its services shall "be performed in a professional and workmanlike manner, consistent with industry standards in the data processing industry."  Agreement, ¶ 8.

17)     The Agreement further requires the DNC to "take all measures necessary to protect the secrecy of, and to avoid disclosure and unauthorized use of" confidential information disclosed by the Campaign to the DNC ("Confidential Information").   Agreement, ¶ 7(a). Pursuant to the Agreement, the DNC undertakes to "immediately notify the Campaign in the event of any unauthorized use or disclosure of the [Campaign's] Confidential Information

including the full extent of the time, place and manner of the use or disclosure and the corrective steps taken by the DNC to address the unauthorized use or disclosure." *Id.*

18)    Upon information and belief, the DNC has executed similar agreements with other candidates' political campaigns ("Voter Data Agreements"), requiring the DNC to safeguard Confidential Information that might be disclosed by those campaigns.  Though the Agreement disclaims that the "DNC may provide its services to other individuals or entities," the Agreement clearly states that "<u>such other independent services shall in no way impair the DNC's ability to provide its obligations and services to the Campaign pursuant to this Agreement</u>." Agreement, ¶ 11 (emphasis added).

19)    The Agreement does not obligate the Campaign to maintain specific security measures with respect to Confidential Information, to notify the DNC of security breaches arising in the DNC's Voter Data systems, or to protect any confidential information inadvertently disclosed to the Campaign by the DNC.

*The Security Incident*

20)    On the morning of December 16, 2015, NGP VAN released a modification (the "Release") to the software that the Campaign and other candidates use to access Voter Data.

21)     This Release contained a critical security flaw (the "Bug") that allowed the Campaign and other presidential candidates to view Confidential Information disclosed by competing campaigns.

22)    The Bug was resolved within approximately four hours, by the afternoon of December 16, 2015.

23)    Upon information and belief, a similar security incident arose with the NGP VAN software during the 2008 national presidential primaries, resulting in the unintentional

transmission of Confidential Information to the campaign of Democratic primary candidate Hillary Clinton (the "Prior Incident").

24)     Before the Bug could be resolved, several staff members of the Campaign accessed and viewed Confidential Information (the "Disclosed Information") that had been disclosed to the DNC by the 2016 campaign of Democratic presidential candidate Hillary Clinton (the "Competing Campaign").

25)     When the Bug and resulting leak of the Disclosed Information were brought to the attention of senior Campaign staff, the Campaign conducted an internal investigation that revealed that one individual may have repeatedly accessed Disclosed Information.  The Campaign immediately terminated this staff member.

26)     On December 17, 2015, at approximately 2:47 p.m., the DNC suspended or terminated the Campaign's Voter Data access.  The suspension or termination of the Campaign's access was undertaken without contractual cause, and in contravention of the Agreement's termination protocols.

27)     The DNC did not send the Campaign any written notice of termination, much less afford the Campaign the contractually required ten-day period in which to cure any default.

28)     The Campaign's inadvertent access of the Disclosed Information did not constitute a breach of any provision of the Agreement.  Even assuming, *arguendo*, that the DNC could prove that Campaign staff intentionally accessed any Disclosed Information, such access would not amount to a breach of the Agreement, or give the DNC cause to suspend or terminate the Agreement.

29)     To the extent that the DNC is obligated to protect the Confidential Information of the other campaigns by virtue of Voter Data Agreements separately executed with those

campaigns, it is the DNC and not the Campaign that is in breach of those contractual duties.  The Campaign should not be punished for the carelessness of the DNC and its third-party vendor.

30)      Whatever duties the DNC may have to protect the Confidential Information of the Competing Campaign, the DNC's Agreement with the Campaign clearly states that these obligations "shall in no way impair the DNC's ability to provide its obligations and services to the Campaign pursuant to this Agreement."  Agreement, ¶ 12.

31)      The DNC may not suspend the Campaign's access to critical Voter Data out of haste or desperation to clean up after the DNC's own mistakes.

32)      Upon information and belief, no action was taken in response to the Prior Incident in 2008, nor was any candidate's access to Voter Data suspended as a result of that Incident.

33)      Upon information and belief, the Campaign's own Confidential Information might have also been compromised by virtue of the Bug in the December 16 Release.

34)      The Campaign is hamstrung without access to the Voter Data.  With each passing day, the Campaign loses critical fundraising and publicity opportunities.

35)      The financial damage caused by the loss of donations is estimated to be approximately $600,000.00 per day.  However the damage to the Campaign's political viability, as a result of being unable to communicate with constituents and voters, is far more severe, and incapable of measurement.

36)      The DNC's unwarranted, unilateral suspension of the Campaign's Voter Data access directly impacts one of the nation's most important electoral races, and carries political implications on a national scale.  The DNC should not be permitted to tip the scales of the Democratic presidential primary without clear justification and contractual cause.  The fairness

of this pivotal national election should not be compromised because of security flaws introduced

by the DNC and its vendor.

## FIRST CLAIM
(Breach of Contract – Specific Performance)

37)     Plaintiff repeats and realleges paragraphs 1 through 37 above as if fully set forth

herein.

38)     The Agreement requires Defendant to implement best practices and reasonable

data security to protect Confidential Information and data submitted by the Campaign and the

Competing Campaign.

39)     Defendant has failed to implement reasonable data security measures, resulting in

the inadvertent disclosure of the Competing Campaign's Confidential Information.   Upon

information and belief, the Plaintiff's Confidential Information has also been disclosed.

40)     The Agreement prevents Defendant from suspending or impairing its performance

under the Agreement, even if ostensibly necessary for the purpose of providing other Voter Data

services to other campaigns.

41)     Defendant has wrongly suspended and impaired its performance of its Agreement

with Plaintiff to mitigate damage caused by its own breach of Voter Data Agreements entered

with other campaigns.

42)     The Agreement does not permit the Defendant to suspend or terminate service to

Plaintiff in the absence of ten days' written notice to Plaintiff, and Plaintiff's failure to cure any

breach or default within a period of ten days.

43)     Defendant has wrongfully suspended the Plaintiff's Voter Data access without

providing the contractually required notice, without identifying any breach of the Agreement by

Plaintiff, and without affording Plaintiff any opportunity to rectify any alleged breach.

44)     In view of the foregoing, Plaintiff continues to incur substantial financial, reputational and political injury.

45)     As a not-for-profit electoral organization with political objectives, Plaintiff's loss of funds and publicity is not compensable with damages.  Plaintiff has no adequate remedy at law.

46)     Plaintiff intends to request a temporary restraining order immediately, mandating that Defendant restore the Campaign's access to the Voter Data system, pursuant to the terms of the Parties' Agreement.

## SECOND CLAIM
(Negligence – Pled in the Alternative)

47)     Plaintiff repeats and realleges paragraphs 1 through 47 above as if fully set forth herein.

48)     Defendant has failed to exercise reasonable care and diligence in maintaining the security of its Voter Data systems.

49)     By virtue of Defendant's failures of care and diligence, Plaintiff's access to the Voter Data systems has been suspended or revoked.  Upon information and belief, Plaintiff's Confidential Information has also been compromised.

50)     Based on the foregoing, Plaintiff has been injured in an amount to be determined at trial, but known to exceed $75,000.00.

## THIRD CLAIM
(Negligent Hiring and Supervision – Pled in the Alternative)

51)     Plaintiff repeats and realleges paragraphs 1 through 51 above as if fully set forth herein.

52)      Defendant has failed to exercise reasonable care and diligence in delegating maintenance of its Voter Data systems to the third-party vendor NGP VAN.

53)      Defendant has failed to exercise reasonable care and diligence in ensuring that the security breaches that occurred during the Prior Incident, under Defendant's supervision, would not recur.

54)      By virtue of Defendant's negligence, Plaintiff's access to the Voter Data systems has been suspended or revoked.   Upon information and belief, Plaintiff's Confidential Information has also been compromised.

55)      Based on the foregoing, Plaintiff has been injured in an amount to be determined at trial, but known to exceed $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Bernie 2016, Inc. respectfully requests that judgment be entered against Defendant DNC Services Corporation:

A.    Mandating Defendant's specific performance of the Parties' Agreement, and Defendant's immediate restoration of Plaintiff's access to the Voter Data system;

B.    On the second and third causes of action, for damages in an amount determined to be at trial, but presently known to exceed $75,000.00; and

C.    For such other, further and different relief as the Court deems just and proper.

Dated: December 18, 2015

Respectfully submitted,

GARVEY SCHUBERT BARER

By: /s/  Benjamin J. Lambiotte
      Benjamin J. Lambiotte, Esq.
      D.C. Bar. No. 421288

      /s/  Sean C.  Griffin
      Sean C. Griffin
      D.C. Bar. No. 442284

*Attorneys for Plaintiff*
1000 Potomac Street N.W.
5th Floor
Washington, D.C. 20007-3501
(202) 298-2525
(202) 965-1729 (fax)

GSB:7438731.1